IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ANAYANSSI DÍAZ<br><br>Plaintiff<br><br>v.<br><br>INFOTECH AEROSPACE SERVICES, INC; LUIS MERCADO; ADAM GRAVSETH; JEFFREY TRACEY (*SIC*)<br><br>Defendants | CIVIL NO. 10-1103 (JAF)<br><br>JURY TRIAL DEMANDED |

## JOINT PROPOSED PRE-TRIAL ORDER

TO THE HONORABLE COURT:

COME NOW Plaintiff and Defendants, through their respective undersigned attorneys, and pursuant to this Court's Order of October 26, 2011 (Docket #71), Local Rule 16(d) of this Court, and Federal Rule 16 of Civil Procedure, respectfully submit the following Joint Proposed Pre-Trial Order.

### I.   COUNSELS FOR THE PARTIES

Anayanssi Díaz is represented by Attorney Johanna Emmanuelli Huertas from the Law Offices of Pedro Ortiz Álvarez, PO Box 9009 Ponce, Puerto Rico 00732-9009, Tel. (787) 841-7575, Fax (787) 841-0000, e-mail: jmeh@poalaw.com.

Defendants are represented by attorneys Edwin J. Seda-Fernández and Mariel Y. Haack, Esq., of the law firm Adsuar Muñiz Goyco Seda & Pérez-Ochoa, P.S.C., located in

the Westernbank World Plaza, Suite 1400, 268 Muñoz Rivera Avenue, Hato Rey, Puerto Rico, 00918.  Defendant's counsels' telephone numbers are (787) 281-1822 and (787) 281-1951 respectively; their fax number is (787) 756-9010; emails: seda@amgprlaw.com and mhaack@amgprlaw.com.

## II. NATURE OF THE ACTION AND/OR BRIEF FACTUAL STATEMENT OF EACH PARTY'S CLAIM

**Plaintiff:**

This is a case under the Equal Pay Act, 29 USC §206, Title VII of the Civil Rights Act, 42 USC §2000e for discrimination, salary disparity against a female; retaliation, and causes of action under local laws for retaliation and gender discrimination and bad faith negotiations.

**Defendant:**

This is a case under the Equal Pay Act, 29 U.S.C. §206(d)(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*; and retaliation and attorney's fees under 42 U.S.C. §1988.   In sum, Plaintiff alleges discrimination in the form of a wage disparity between herself and an allegedly similarly situated male employee, as well as retaliation for her alleged opposition to Defendant's discriminatory practices.

However, the record in this case shows that Plaintiff was never subjected to any such discrimination or retaliation.   To the contrary**,** any wage disparity between Ms. Díaz and the employee in question was due to *bona fide* factors other than sex. Furthermore, Ms. Díaz was never subjected to retaliation in any manner or form.   The

2

record shows that Ms. Díaz is simply a thin-skinned individual who overacts to the ordinary tribulations of the workplace.    In light of these facts, Defendants sustain that no discriminatory action has been taken against Ms. Díaz, and her claims must be dismissed, with prejudice.

**III.   STATEMENT OF THE PARTIES' CONTENTIONS AND THEORIES**

**A.   Factual Theories and Contentions**

**Plaintiff:**

Plaintiff's evaluations showed that she was the top employee at the Project Management Department in Infotech. She was given the most complex work at the department. In 2008 the company hired a man, Soto, as Specialist III to work at the PM Department. During that year, he was placed in probation, because of his deficient performance. Later that year plaintiff was evaluated and promoted to the position of Specialist III and ranked as capability C. While Soto was earning $65,000, she was given a salary of $50,000. When she learned of the disparity, she wrote a letter to the Human Resources Department and requested an investigation. Ms. Neysa Soto evaluated and she rendered an opinion that the disparity should be corrected. Plaintiff received an offer to give her the same salary. She requested a retroactive payment. She then received notice that her request would be granted, but that she had to sign a general release. When her lawyer read the release, she found the language to be too broad and requested a meeting.

During the meeting the attorney for Infotech, Mr. Seda, refused to change the language. He then recommended Infotech to withdraw the offer.

After plaintiff filed her request for investigation, she began feeling harassed. A complex project that she was going to lead was removed from her. This project was then given to Soto who, up to that moment, had not handled any complex work, in an effort to justify his high salary. Plaintiff was given few and simple tasks. She felt that her preparation and potential was going to waste and that Infotech was disrespecting her as a well recognized professional. Her supervisors began to follow and question her work and how she managed her time. Because of this, plaintiff began having panic attacks and got sick. Her doctor recommended that she remain out of work for some time. After returning, plaintiff requested an I-Pass so that she could work from home. Her request was approved after months of follow up, and only when Tracey was removed from the position.

**Defendants:**

Plaintiff began her employment with IAS in 2005, as a Specialist II, assigned to the Performance Aerodynamics/Thermodynamics Department. Her starting salary was $40,000.00. Her starting salary was consistent with IAS' salary guidelines at the time.

In late 2007, IAS identified a need for a Manager in the Project Management department. Due to the nature of the work that IAS wanted to attract, there was also an identified need for a Specialist III position. As a result, a job posting was published. At the time, Plaintiff was not a Specialist III, but rather a Specialist II, with Capability B.

Mr. Alex Soto submitted his resume to IAS, and was interviewed by two (2) departments: the Design Department and the Performance Engineering Department. Mr. Soto gave very strong interviews, and all those who interviewed him agreed that he was an excellent candidate, whose education and relevant experience in project management would allow the company to accept more complex assignments.   He had a strong background in Project Management, inasmuch as he had four (4) years of experience as a Project Manager, which the interviewers felt would translate well to working with IAS.   Also, Mr. Soto had Master's level courses and experience in both Nuclear and Mechanical Engineering, which could be very valuable to IAS.

Furthermore, at the time of his interview, Mr. Soto showed great potential for rapid promotion within the company to a position of greater responsibility.   Mr. David Connor testified during his deposition that his assessment of Mr. Soto was that he was "very good". Mr. Adam Gravseth, who interviewed Mr. Soto, recommended him for a management level position.

Mr. Soto was earning a substantially higher salary than IAS usually offered at his current job, approximately $90,000.00.   Consequently, in order to retain him, IAS determined it would be necessary to make him a competitive offer. Based on his resume and strong interview, it was decided that he would be offered a Specialist III position, at a salary of $65,000.00.   If he performed well within his first year, he would be promoted to a managerial position.

When the offer was extended to Mr. Soto, he contacted IAS and informed that the

–5–

salary offered was below his expectations. However, Mr. Gravseth urged him to consider the benefits of working closer to home, as well as the possibility for rapid growth that IAS offered, and eventually convinced him to accept the offer and work at IAS. Subsequently, in September 2008, Plaintiff was promoted to Specialist III, with a salary of $50,000.00.   Her salary was based on her progression in accordance with IAS' merit system.

On Mach 12, 2009, Ms. Díaz approached the Human Resources Department to discuss her concerns over the pay disparity between herself and Mr. Soto.   At that time, the Human Resources Department indicated to Ms. Díaz that an investigation would be conducted, and she would be informed of the results.

The investigation revealed that the disparity resulted from the fact that Mr. Soto gave very strong interviews, and all those who interviewed him agreed that he was an excellent candidate, whose education and relevant experience in project management would allow the company to accept more complex assignments.

Mr. Soto had a strong background in Project Management, inasmuch as he had four (4) years of experience as a Project Manager, which the interviewers felt would translate well to working with IAS. Also, Mr. Soto had Master's level courses and experience in both Nuclear and Mechanical Engineering, which could be very valuable to IAS.   Further, at the time of his interview, Mr. Soto showed great potential for rapid promotion within the company to a position of greater responsibility. Moreover, since he had been earning a great deal more where he worked at the time of his interview, it was necessary to offer him

a competitive salary in order to retain him as an employee. These are all reasonable factors other than sex which account for the pay disparity between Mr. Soto and Ms. Díaz.

At the time, another similarly situated Specialist III, who was a male, was earning less than Ms. Díaz.   After completing its investigation, IAS concluded that no irregularities had motivated the pay disparity.

Notwithstanding, after a performance-based analysis was undertaken, IAS informed Ms. Díaz that, as a good faith effort to resolve her concern, the Company was willing to match her salary to that of Mr. Soto. Ms. Díaz was unsatisfied with the prospective adjustment offer, and demanded that the adjustment be retroactive.

In a further good faith attempt to solve the matter amicably and expeditiously, IAS agreed to a retroactive adjustment of Ms. Díaz's salary.   Such retroactive payment would have resulted in a lump-sum payment of the differential for seven (7) months and the immediate adjustment.   IAS, however, simply conditioned the retroactive adjustment to the execution of a no-fault general release.   This practice is totally acceptable and reasonable, and had the purpose of settling with Ms. Díaz **any and all** disputes regarding her employment **up to the date of the execution of the release.**   To be clear, the release agreement did not extend to any claims arising after the execution of the same.

Ms. Díaz requested time to consider IAS' offer, and ultimately decided, on advice of her attorney, that she would not accept the salary adjustment nor the retroactive salary increase conditioned on the execution of the release agreement.

Since that time, Plaintiff has continued to work at the Company.   She has since

continued to receive pay increases based on merit, and currently has a salary of $58,080.48, an increase of $8,080.48 since she first complained.   Her salary is consistent with IAS' current salary scales.   It must be noted that as of this date, there are two (2) similarly situated male employees in the position of Specialist III who earn less than the Plaintiff. She is likewise eligible for promotions based on merit. Ms. Díaz also receives yearly evaluations. Her evaluations are generally positive.

Throughout her career at IAS, Plaintiff has been assigned work in the same manner as other employees.   She was assigned complex projects when they were available. Complex projects are not always available. If no complex projects were available, Plaintiff would be assigned the work that was available at the time that best suited her skills and the Company's needs. Also, depending on how much work is available in Plaintiff's department, work is sometimes re-assigned or re-distributed to ensure that everyone has a balanced work load. This is a typical practice within the department.

Plaintiff has had problems with absenteeism since 2009, when she returned from maternity leave1.   In 2011, Plaintiff has only attended work 53% of working days.   Of the days she has attended, 13% of the time she has left without completing an 8-hour day. Plaintiff's supervisors concur that her absenteeism has affected their ability to assign her high level work, because they cannot rely on her.   Ms. Josymar Acosta, Plaintiff's current supervisor, testified during her deposition since Ms. Díaz does not come to work consistently, her work often has to be re-assigned to other employees, which is very

---

1 Plaintiff suffered a miscarriage. She was fully compensated and given eight (8) weeks of paid maternity leave, as required by law.

disruptive.

Ms. Acosta explained that big projects are very important to the company, and must be assigned to employees who will be there for the client and for the team.   Moreover, since large projects are so important, they are highly coveted, and it is essential that they go to the best person for the job. All in all, if a big project is not properly supported, the company risks losing the project, or even the client.

Mr. David Connor, former Discipline Chief of Plaintiff's department, and Ms. Josymar Acosta, Plaintiff's current supervisor, both testified during their depositions that they have no reservations as to the type of work Plaintiff can perform, but she has to attend work consistently in order to receive top assignments. In fact, Ms. Acosta testified during her deposition that she would "love" to be able to market Plaintiff's skills in order to get complex work for her and the company, but with her attendance issues, it is not possible at this point.

On the other hand, approximately in April of 2009, Mr. Adam Gravseth was asked by IAS' General Manager at the time, Jim Becker, to temporarily assume the duties of Manager of the Project Management Department because the company was not satisfied with the performance of Mr. David Connor in that position, and would be transferring him to the position of Discipline Chief.   As a result of this change, Mr. Gravseth was forced to physically relocate to the area where the Project Management department was located.

Due to space constraints, Mr. Jim Becker and Mr. Jeff Tracy advised him that no

manager-type cubicles were available, and that he would occupy a vacant supervisor-style cubicle.   That cubicle happened to be across from Plaintiff's desk. The change only lasted approximately three (3) to four (4) months, after which Mr. Gravseth returned to his position as Chief of Operations.

The Utilization Rate ("UR") is the percent of hours billed versus time spent in the workplace. The average UR of a department is the measure upon which the department's (and the manager's) performance is evaluated. Mr. Gravseth testified during his deposition that the low department UR of the Project Management department was part of the reason he was called upon to assume management of the department. As a result, when he assumed the role of Manager of the Department, he conducted a one-on-one inquiry regarding the UR with each employee in his department with a UR under 90%. In approximately April of 2009, Ms. Anayanssi Díaz was completing an important, highly complex project for the Pratt & Whitney CSMC team, the HPW3000 program. The project was near completion.   At the same time, between March and May of 2009, another complex CSMC project was beginning, the FanDemo project. Mr. Jim Becker, IAS' Chief Engineer, was directly overseeing the project. The project was highly sensitive, and the client requested that it have restricted access. Due to the complexity of the assignment, Mr. Becker needed a full-time, high-capability Project Management employee to start this program.

Initially, Ms. Díaz was considered for the assignment.   However, Ms. Díaz was occupied at the time with the conclusion of the HPW3000 project, and Mr. Becker could

–10–

not afford to have her working part time on both projects, as it would have disappointed the customers involved. Consequently, Mr. Becker chose Mr. Alex Soto for the project, inasmuch as he was available, capable, and had a skill set suited to the project.   Plaintiff testified during her deposition that she does not know why Mr. Soto was assigned to work on that project.

Ms. Díaz subsequently concluded her work on the HPW3000 project.  Since no other large or complex assignments were immediately available, Plaintiff was assigned to other available projects.

Mr. Jeffrey Tracy, who was in charge of approving I-Pass petitions, testified that during his employment at IAS, efforts were underway to tighten IAS' security practices, including IT and network security.   For that purpose, the Federal Bureau of Investigation was brought to IAS on more than one occasion to provide awareness to IAS' management on how to improve security at IAS' facilities. This was necessary due to the fact that IAS carries out projects for the Department of Defense, and works extensively with export-controlled information.

An I-Pass provides remote access to IAS' network and servers, which contain both export controlled and proprietary information.   As part of IAS' efforts to improve security, Mr. Tracy tightened the requirements for obtaining an I-Pass, limiting it to managers, supervisors, and certain employees who were involved with projects that required remote access to IAS' network, either based on travel, or at the client's request. Mr. Tracy testified that working from home was not a good enough reason to issue an

I-Pass.   Mr. Tracy communicated this policy in an email to all managers at IAS.   Based on the new policy regarding the approval of I-Pass requests, Mr. Tracy denied a number of I-Pass requests to both males and females.

In 2009, Ms. Josymar Acosta, Ms. Díaz's supervisor, approached Mr. Tracy and indicated that Ms. Díaz was interested in receiving an I-Pass so that she could work from home. Mr. Tracy notified Ms. Acosta that working from home was not sufficient reason to issue an I-Pass. Ms. Acosta then informed Mr. Tracy that there were medical reasons for the request. Mr. Tracy then referred the matter to the Human Resources Department, which indicated that Ms. Díaz should submit a medical certificate evidencing her need to work from home with an I-Pass.

Once the information was provided, Mr. Tracy considered Ms. Díaz's request, and determined that she could complete the majority of her work at home on a company laptop, without an I-Pass. He then notified Ms. Díaz's supervisor of his inclination to deny the request. Mr. Tracy never formally denied Ms. Díaz's request for an I-Pass, and her application for an I-Pass was eventually granted in 2010.

However, Ms. Josymar Acosta testified during her deposition that, though Plaintiff received an I-Pass, Ms. Díaz has never requested to work from home, with or without the I-Pass. Ms. Acosta would have knowledge of this because employees must inform either their supervisor or their manager that they intend to work from home, and discuss with them the timeframe and tasks that they propose to complete outside the office.

Defendants respectfully submit that all of their exhibits have been duly

authenticated.

Defendants respectfully submit that the facts in this case simply do not support a cause of action for discrimination or retaliation of any kind. Consequently, this case must be dismissed, with prejudice.

## B.      Legal Theories and Contentions

**Plaintiff:**

EPA requires that salaries be paid to men and women performing the equal work based solely on actual job performance and requirements. Only bona fide reasons "based on other factor other than sex" is allowed as exception. Among these exceptions, the courts have found the following basis for different salaries: 1) merit system;  2) seniority system; 3) system that measures earning by quantity or quality; 4) other differential used  based on other factor other than sex.   The fact that the workers perform their tasks in different shifts do not cure the defect of an illegal salary disparity if the higher salary is based on the fact that men "would not work at the low rates paid women".  Corning Glass Works v Brennan, 417 US 188, 205 (1974).  "The Equal Pay Act is broadly remedial and it should be construed and applied so as to fulfill the underlying purpose which Congress sought to achieve."  Id at 208.

> In order to establish a prima facie case, an employee must show that "an employer pays different wages to employees of opposite sex 'for equal work on jobs the perfomance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions.'" Id at 195.

Infotech alleges that the salary disparity between Díaz and Soto is based on a factor other than sex: the market. They allege that Soto was given a higher salary as Specialist III because they wanted to hire him and, thus, he was offered a high salary to bring him to Infotech. The problem with this argument is that, once Soto is in Infotech and his job performance is deficient, plaintiff —whose job performance was outstanding— was promoted to Specialist III, but not given the same salary as Soto. Here, the "market" defense is meritless. Soto and Díaz were already working at Infotech and both were performing the same duties. Díaz was excellent, while Soto was deficient. Infotech had no reason whatsoever for not giving Díaz the same salary as Soto. Once Infotech decided to grant a salary for a position of Specialist III in the Project Management Dept. —the first one created—, Díaz was entitled to receive the same salary.

Here the problem lies in the optics. If Díaz had been a Specialist III at the moment of Soto's hiring, then IAS could try to argue the market and competitive salary defenses. But here, IAS granted a salary to a newly Specialist III in the Project Management Department. That was his entry salary. While his work was deficient, Plaintiff was handling work of a Specialist III and Capability C, although she had not formally received the titles. But once she does, what is IAS' defense for not giving her the same salary as Soto's? There is none. In fact, if the Court would allow employers to argue that they can give different salaries to their employees, disregarding their own salary guidelines, it would allow employers to discriminate because of sex with impunity.

Once plaintiff filed a request for investigation, she was informed that her salary would be equaled, but for merit reasons. Later, Infotech also agreed to give her a retroactive payment from the date of her promotion. Nonetheless, Infotech required the signing of an agreement which contained a broad waiver of rights that plaintiff objected. Infotech refused to negotiate in good faith regarding the language of the agreement and, after a meeting, sent a letter withdrawing the offer, in violation of Puerto Rico laws regarding good faith in negotiations. See Prods. Tommy Muñiz v COPAN, 113 DPR 511, 517 (1982).

Furthermore, once plaintiff objected, a big and complex project that had been assigned to her was taken away and given to Soto. After that, only small assignments were given to her. Because of the stress caused by the discriminatory actions, plaintiff fell sick. She requested an I-Pass to work from home, but was not granted until several months after, and only when a different officer took charge of the request.

**Defendants:**

    **A.**    **Equal Pay Act**

    **i.**    ***Plaintiff has failed to establish a valid claim under the EPA***

The Equal Pay Act, 29 U.S.C. §206(d)(1) ("EPA") prohibits wage discrimination between employees on the basis of sex for equal work on jobs, the "performance of which requires skills, effort, and responsibility and which are performed under similar conditions".   To establish a *prima facie* case, a plaintiff must show that the employer

paid different wages to an employee of the opposite sex for substantially equal work. Corning Glass Works v. Brennan, 417 U.S. 188, 94 S.Ct. 2223, 41 L. Ed. 2d 1 (1974).

To rebut the *prima facie* case, the employer must establish as an affirmative defense that the wage discrepancy resulted from (1) a seniority system; (2) a merit system; (3) a system measuring earnings by quantity or quality of production; or (4) a differential based on a factor other than sex. Corning Glass Works v. Brennan, *supra* at p.196. Acceptable factors "other than sex" include experience, prior salary, education, skills which the employer deems useful to the position, and a proven ability to generate higher revenues for the employer's business. See, for example, Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 176 (D. Mass. 2001); Mullenix v. Forsyth Dental Infirmary for Children, 965 F. Supp. 120, 140 (D. Mass. 1996); Dubowsky v. Stern, Lavinthal, Norgaard & Daly, 922 F. Supp. 985, 990 (D. N.J. 1996).   If established, any of the four exceptions is a complete defense to conduct that would otherwise violate the statute.   29 U.S.C. §206(d)(1).   As we will show herein below, in the instant case it is patently clear that the wage disparity at issue is due to *bona fide* factors other than sex.   To wit: a strong interview, important skills deemed useful for the position, and a high prior salary. Let us see.

As discussed herein above, in March 2009, Ms. Díaz approached the Human Resources Department to discuss her concerns over the pay disparity between herself and Mr. Soto.   Ms. Díaz's concern regarding her alleged salary disparity with Mr. Soto was given serious consideration and was thoroughly investigated by the Defendants.

However, as shown herein above, IAS concluded that legitimate factors other than sex had simply resulted in a justifiable wage disparity between two employees within the company.

Specifically, the investigation revealed that the disparity resulted from the fact that Mr. Soto gave very strong interviews, and all those who interviewed him agreed that he was an excellent candidate, whose education and relevant experience in project management would allow the company to accept more complex assignments.   To wit, Mr. Soto had a strong background in Project Management, inasmuch as he had four (4) years of experience as a Project Manager, which the interviewers felt would translate well to working with IAS.   Also, Mr. Soto had Master's level courses and experience in both Nuclear and Mechanical Engineering, which could be very valuable to IAS.   Further, at the time of his interview, Mr. Soto showed great potential for rapid promotion within the company to a position of greater responsibility. Since he had been earning a great deal more where he worked at the time of his interview, approximately $90,000.00, it was necessary to offer him a competitive salary in order to retain him as an employee. Still, the fact remains that Mr. Soto **actually took a pay cut** in order to work at IAS.

The foregoing are all reasonable factors other than sex which account for the pay disparity between Mr. Soto and Ms. Díaz. The pay disparity has steadily closed over the years, as Ms. Díaz has continued her progression within the Company.   At that time, another similarly situated Specialist III, who was a male, was earning less than Ms. Díaz. In fact, as of today, Ms. Díaz is compensated at a higher rate than some of her

similarly-situated male co-workers.

From the foregoing, it is clear that, while the circumstances surrounding Mr. Alex Soto's hiring certainly resulted in a wage disparity, the disparity was based on legitimate factors other than sex.   Consequently, Ms. Díaz's claim under the Equal Pay Act must be dismissed, with prejudice.

**B.    Title VII**

Title VII of the Civil Rights Act of 1964, 42 USC § 2000e-2 *et seq.*, prohibits employer from failing or refusing to hire, or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.    42 U.S.C. §2000e-2.   In the instant case, Plaintiff has brought claims under Title VII for alleged disparate treatment.   As we will show herein below, Plaintiff's claims are without merit, and must be dismissed.

In order to prove a disparate treatment claim under Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her position and met her employer's expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment.   Prescott v. Higgins, 538 F. 3d 32, 41 (1st Cir. 2008).   In order to make out a claim of disparate treatment, Plaintiff must make a showing of discriminatory intent. Graphics Comms. Int'l Union, Local 12-N v. Quebecor Printing Providence, Inc., 270 F. 3d 1, 4-5 (1st Cir. 2001).

The core inquiry in a gender based disparate treatment case is whether the defendant **intentionally discriminated against the plaintiff because of her gender**. Ahern v. Shinseki, 629 F. 3d 49, 54 (1st Cir. 2010) (citing Rathburn v. Autozone, Inc., 361 F. 3d 62, 71 (1st Cir. 2004)).   When considering a motion for summary judgment on a Title VII claim, the court may "dispense with strict attention to the Title VII burden shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.   Gómez González v. Rural Opportunities, Inc., 626 F. 3d 654, 662 (1st Cir. 2010).   However, even if a plaintiff demonstrates pretext, the Title VII claim will not survive summary judgment **unless the plaintiff also creates a genuine dispute of material fact as to whether "the real reason for the employer's actions was discriminatory animus based on a protected category".**   Mariani- Colón v. Department of Homeland Security ex. rel. Chertoff, 511 F. 3d 216, 223 (1st Cir. 2007).   We respectfully submit that Plaintiff simply cannot make this showing.

In the instant case, there is not a scintilla of evidence on the record which would indicate that IAS deliberately discriminated against Plaintiff on her gender.   To the contrary, the record shows that Plaintiff was hired at IAS in March of 2005, as a Specialist II.   She has been given progressive salary increases based on her performance, as per IAS' merit system, and she was promoted to the position of Specialist III in September of 2008.   Her salary is consistent with IAS' salary scale for her position.   Her evaluations have generally been good, and she has received several

merit bonuses. Furthermore, throughout her career at IAS, she has been assigned work in the same manner as other, similarly situated employees.   Moreover, she was consistently assigned high-profile, complex work assignments (when available), until severe attendance issues made her supervisor, Josymar Acosta, reluctant to assign big projects to her, for fear that she would not support them properly and would cause IAS to lose projects, or even clients.   Ms. Acosta testified that she would "love" to be able to assign Ms. Díaz high-profile work, and that if Ms. Díaz's attendance improved, she would resume providing her those assignments. This sentiment was echoed by Mr. David Connor, former Discipline Chief for Plaintiff's department, who testified during his deposition that Plaintiff was technically very competent, but her attendance issues made her unreliable and therefore not suited to high-profile assignments.

Her concern regarding her alleged salary disparity with a similarly situated male employee was given serious consideration and was thoroughly investigated by the Defendants.   However, as shown herein above, IAS concluded that factors other than sex had simply resulted in an anomaly within the company.   The pay disparity has steadily closed over the years, as Ms. Díaz has continued her progression within the Company.   In fact, as of today, Ms. Díaz is compensated at a higher rate than some of her similarly-situated male co-workers.

In view of the foregoing, Defendants respectfully submit that Plaintiff's claim of discrimination is devoid of merit, and must be dismissed.

C.      **Retaliation under Title VII and the EPA**

Title VII of the Civil Rights Act of 1964 prohibits discrimination against employees who have engaged in protected activities, including having made a charge, testified, assisted, or participated in a Title VII proceeding or investigation.   42 U.S.C. 2000e-3.   In order to establish a *prima facie* case of retaliation under Title VII and the EPA must establish: (1) plaintiff's protected conduct; (2) a materially adverse employment action that harmed the plaintiff inside or outside the workplace and that was harmful enough to "dissuade a reasonable worker from making or supporting a charge of discrimination"; and (3) the adverse action taken was causally linked to plaintiff's protected activity.   See, Mariani-Colón v. Department of Homeland Security ex. rel. Chertoff, 511 F. 3d 216, 223 (1st Cir. 2007).

The United States Supreme Court has held that, in order for a plaintiff to prove that she has suffered an adverse employment action, she must show that "a reasonable employee would have found the challenged action materially adverse", which is to say that "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination".   Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).   The alleged retaliatory action must produce a significant, not trivial, harm.   Carmona Rivera v. Commonwealth of Puerto Rico, 464 F. 3d 14, 19 (1st Cir. 2006).

The United States Court of Appeals for the First Circuit has held that "adverse employment actions include 'demotions, disadvantageous transfers or assignments,

refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'"   Marrero v. Goya of P.R., Inc., 304 F. 3d 7, 23 (1st Cir. 2002). Whether an action is sufficient to support a claim of retaliation is judged objectively and depends on the particular circumstances of the case. Burlington Northern and Santa Fe Ry. Co. v. White, *supra*, at p. 69.

If a plaintiff satisfies the elements of the *prima facie* case a burden of production falls on the employer to put forth a legitimate, nondiscriminatory reason for the adverse employment action.   Valentín-Almeyda v. Mun. of Aguadilla, 447 F. 3d 85, 95 (1st Cir. 2006).   The ultimate burden of persuasion, however, remains with the plaintiff, and she must show that the employer's non-retaliatory reason is a pretext for retaliatory discrimination.   *Id.*

When a plaintiff claims (as is the case here) that she was subjected to a retaliatory hostile work environment, she must show that (1) she is a member of the protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment is based on her protected conduct; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment; (5) that the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim did in fact perceive it to be so; and (6) that some basis for employer liability has been established.   Agusty-Reyes v. Dep't. of Educ. of P.R., 601 F. 45 (1st Cir. 2010).

In the instant case, Defendants concede that Plaintiff meets the first prong of the

*prima facie* case, inasmuch as complaining that IAS had allegedly violated the EPA and subsequently filing a charge before the EEOC constitute protected conduct.   However, Plaintiff cannot establish the remaining elements of the *prima facie* case, inasmuch as Plaintiff was not subjected to any form of harassment, much less any actions that were sufficiently "severe and pervasive" enough as to alter the terms and conditions of her harassment, nor to be found "objectively and subjectively offensive." Consequently, her claim for retaliation must fail.   Furthermore, even if Plaintiff were able to establish a *prima facie* case of retaliation (which is denied), Plaintiff will be unable to show that Defendants' stated legitimate, non-retaliatory reasons for the actions taken with regards to Plaintiff are actually a pretext for retaliatory discrimination.

Plaintiff alleges that after she complained of the alleged wage disparity, she was subjected to a "pattern of harassment and retaliation".   In support of this assertion, Plaintiff alleges that (1) her new supervisor was moved to a cubicle four (4) feet in front of hers, to "constantly monitor" her actions; (2) that she was assigned to low budget projects specifically to force her to have a low performance; and (3) she was denied an I-Pass so that she could work from home. Plaintiff also alleges that Mr. Luis Mercado personally engaged in a pattern of harassment and retaliation against her. However, the fact of the matter is that these alleged actions are neither materially adverse, nor causally linked to plaintiff's protected activity.

To begin with, Adam Gravseth testified during his deposition that, approximately in April of 2009, he was asked by IAS' General Manager at the time, Jim Becker, to

temporarily assume the duties of Manager of the Project Management Department because the company was not satisfied with the performance of Mr. David Connor in that position, and would be transferring him to the position of Discipline Chief.   As a result of this change, Mr. Gravseth was forced to physically relocate to the area where the Project Management department was located.   Due to space constraints, Mr. Jim Becker and Mr. Jeff Tracy advised him that no manager-type cubicles were available, and that he would occupy a vacant supervisor-style cubicle.   That cubicle happened to be across from Plaintiff's desk. In light of the fact that Mr. Gravseth's transfer to the Project Management department was based on the company's legitimate business needs, it has nothing to do with Ms. Díaz, and is consequently neither materially adverse nor causally related to her protected conduct.   Furthermore, the change was temporary, approximately three (3) to four (4) months, after which Mr. Gravseth returned to his position as Chief of Operations.

During her deposition, Plaintiff testified that she felt "harassed" by Mr. Gravseth because when he became her supervisor, the first thing he allegedly did was call her into his office and ask her why her Utilization Rate ("UR") was below the target of 90.   The UR is the percent of hours billed versus time spent in the workplace.   As mentioned in previous sections of this Motion, the average UR of a department is the measure upon which the department's (and the manager's) performance is evaluated. Mr. Gravseth testified during his deposition that the low department UR of the Project Management department was part of the reason he was called upon to assume management of the

department.    He conducted a one-on-one inquiry regarding the UR with each employee in his department with a UR under 90%.    This inquiry is directly related to Mr. Gravseth's duties as Manager of the Project Management department.    Moreover, inquiring as to an employee's performance is a legitimate exercise of a managerial prerogative.    Consequently, it is unreasonable for Plaintiff to claim that this single incident made her feel "harassed" in any way.    In any case, this incident is a far cry from what has been found by the courts to be sufficiently "severe" and "pervasive".    See, e.g., Rosario v. Dep't. of the Army, 607 F. 3d 241 (1st Cir. 2010); Marrero v. Goya of P.R., Inc., 304 F. 3d 7 (1st Cir. 2002).

With regards to Plaintiff's claim that her "big" project was taken away, and that she was given "small" projects in order to affect her performance, Plaintiff is again making mountains out of molehills. The record in this case shows that, in approximately April of 2009, Ms. Anayanssi Díaz was completing an important, highly complex project for the Pratt & Whitney CSMC team, the HPW3000 program, which was near completion.

At the same time, between March and May of 2009, another complex CSMC project was beginning, the FanDemo project. Mr. Jim Becker, IAS' Chief Engineer, was directly overseeing the project. The project was highly sensitive, and the client requested that it have restricted access. Due to the complexity of the assignment, Mr. Becker needed a full-time, high-capability Project Management employee to start this program.

Initially, Ms. Díaz was considered for the assignment.    However, Ms. Díaz was

occupied at the time with the conclusion of the HPW3000 project, and Mr. Becker could not afford to have her working part time on both projects, as it would have disappointed the customers involved. Consequently, Mr. Becker chose Mr. Alex Soto for the project, inasmuch as he was available, capable, and had a skill set suited to the project. Plaintiff testified during her deposition that she does not know why Mr. Soto was assigned to work on that project. Consequently, she is merely speculating that there was retaliatory animus behind the decision.

Ms. Díaz subsequently concluded her work on the HPW3000 project. Since no other large or complex assignments were immediately available, Plaintiff was assigned to other available projects. This reason is neither discriminatory nor retaliatory and, therefore, cannot support Plaintiff's retaliation claim. As discussed above, this is a standard practice at IAS, based on the fact that complex or high-visibility projects are not always abundant. It must be noted that Plaintiff's performance evaluation was not impacted in any way by this change, inasmuch as her evaluations have remained consistent throughout her employment.

Furthermore, Plaintiff's current supervisor, Ms. Josymar Acosta, testified that after Plaintiff returned from maternity leave in August 2009, she began to have serious attendance problems, which persist as of today. As shown above, in all of 2011, Plaintiff has only worked about half of the time. Ms. Acosta testified that Plaintiff had become unreliable, and she could not assign her high-profile work because she could not take the risk of Plaintiff failing to properly support the project. Mr. Dave Connor also

testified to this effect, stating that while Ms. Díaz was technically very competent, they could not assign her complex work if they could not count on her to show up at work.

As a related argument, Plaintiff asserts that she was denied an I-Pass, to work from home as retaliation for exercising her rights.   On this issue, Mr. Jeffrey Tracy, who was in charge of approving I-Pass petitions, testified that during his employment at IAS, efforts were underway to tighten IAS' security practices, including IT and network security.   For that purpose, the Federal Bureau of Investigation was brought to IAS on more than one occasion to provide awareness on how to improve security at IAS' facilities. This was necessary due to the fact that IAS carries out projects for the Department of Defense, and controls highly sensitive and proprietary information.

As discussed above, an I-Pass provides remote access to IAS' network and servers, which contain highly sensitive, export controlled and proprietary information. Consequently, as part of IAS' efforts to improve security, Mr. Tracy tightened the requirements for obtaining an I-Pass, limiting it to managers, supervisors, and certain employees who were involved with projects that required remote access to IAS' network, either based on travel, or at the client's request. Working from home was no longer a good enough reason to issue an I-Pass.   Based on the new policy regarding the approval of I-Pass requests, Mr. Tracy denied a number of I-Pass requests to both males and females.

The record shows that Mr. Tracy never formally denied Ms. Díaz's request for an I-Pass, and her application for an I-Pass was eventually granted in 2010.   However, Ms.

Josymar Acosta testified during her deposition that Ms. Díaz has never requested to work from home, with or without the I-Pass.   Ms. Acosta would have knowledge of this because employees must inform either their supervisor or their manager that they intend to work from home, and discuss with them the timeframe and tasks that they propose to complete outside the office.    Consequently, the situation with the I-Pass was neither materially adverse, nor causally linked to her alleged protected conduct.

Finally, regarding the alleged harassment she suffered from Mr. Luis Mercado, Plaintiff testified that the incidents which she characterizes as harassment are limited to one (1) occasion on which Mr. Mercado asked her about her performance on a certain project; one (1) occasion on which Mr. Mercado asked her about another employee whom Plaintiff alleged also had concerns about salary disparity; another occasion on which Mr. Adam Gravseth indicated to her that Mr. Mercado had requested to schedule a meeting with her to follow up on how she felt at work after the pay disparity claim; and the fact that Mr. Mercado had stopped by the security office when she had her alleged panic attack to see what was going on.   These isolated incidents are clearly related to Mr. Mercado's duties as IAS' Human Resources Manager.   Further, the incidents alleged by Plaintiff are trivial in nature and cannot support a cause of action for retaliatory harassment.

From the foregoing, it is quite clear that the alleged adverse actions asserted by Plaintiff are not actionable because they do not rise past the level of minor annoyances or petty slights.   Burlington Northern and Santa Fe Ry. Co. v. White, supra, at p. 68.

Work places are rarely idyllic retreats, and the mere fact that an employee is displeased with an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.   Marrero v. Goya of P.R., Inc., 304 F. 3d 7 (1st Cir. 2002).   Plaintiff has failed to provide any evidence that would support a finding that IAS' actions 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination' other than her own disagreement with those actions. Burlington Northern and Santa Fe Ry. Co. v. White, supra, at p. 68; Morales- Vallellanes v. Potter, 605 F. 3d 27 (1st Cir. 2010).   In view of the foregoing, Defendants respectfully submit that Plaintiff's claims for retaliation under Title VII and the EPA must be dismissed, with prejudice.

### D.   Law 115

Defendants aver that Plaintiff has no claim under Law 115 first of all, because she was not subjected to an adverse employment action, and second, because even if she asserts that she was subjected to an adverse employment action, she cannot establish a causal relationship between her alleged protected conduct and the purported adverse action.   Further, even if this Court were to find that Plaintiff was subjected to an adverse employment action, Defendants have clearly established a legitimate, non-retaliatory reason for said action.   Things being as such, she has failed to establish a *prima facie* case of retaliation.

Plaintiff alleges that Defendants retaliated against her in violation of Puerto Rico's law against retaliation in employment, Law 115 of December 20, 1991, 29 L.P.R.A. 194, *et*

*seq*, ("Law 115") which states in its relevant part as follows:

> § 194a. Discrimination at place of employment for sharing testimony; cause for action--Prohibition; violation; civil liability
>
> (a) No employer may discharge, threaten, or discriminate against an employee regarding the terms, conditions, compensation, location, benefits or privileges of the employment should the employee offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico, **when such expressions are not of a defamatory character nor constitute disclosure of privileged information established by law**.
> (Emphasis ours.)

In <u>Marín Kuilan v. Teddy Díaz Fastening Systems, Inc.</u>,142 D.P.R. 499 (1997), the Puerto Rico Supreme Court had the opportunity to interpret Law 115, and indicated what elements are necessary to establish a cause of action for retaliation under local law. The Court held that the intention behind Law 115 is clearly to balance the interests of the employee and the employer, reason for which the employee must prove, through direct or circumstantial evidence that a violation of the Law occurred. Regarding this, section (c) of Article 2 of Law 115, *supra*, states:

> (c) The employee shall show proof of the violation through direct or circumstantial evidence. The employee shall furthermore establish a prima facie case of violation of the act by proving that he/she participated in an activity protected by §§ 194 et seq. of this title and that he/she was subsequently discharged, threatened or discriminated against regarding his/her employment. Once the aforesaid has been established, the employer shall claim and provide a non-discriminatory legitimate reason for the discharge. Should the employer claim and provide such a reason, **the employee should demonstrate that the alleged reason provided by the employer was a mere pretext for the discharge**. (Emphasis ours)

Article 2 of Law 115 emphasizes that the employee must **prove** the employer's violation of

the law, using direct or circumstantial evidence.   To alleviate the burden of proof, the law provides that a *prima facie* case shall be established when the employee provides evidence that proves that first of all, he participated in one of the activities protected under the law and second, that he was subsequently subjected to an adverse employment action.   Once the employee has met these two requirements, the employer shall provide a non-discriminatory reason for the adverse employment action.   If the employer puts forth a non-discriminatory reason for the adverse employment action, the employee must then, without the benefit of the presumption, prove that the employer's reason is pretextual.

As discussed herein above, Defendants concede that Plaintiff meets the first prong of her *prima facie* case, because filing a charge before the EEOC constitutes protected conduct under Law 115.   However, the record in this case clearly establishes that Plaintiff was never subjected to retaliation of any sort after the filing of her claim.   In order to avoid being repetitious, we refer the Court's attention to the discussion of Plaintiff's retaliation claims under Title VII and the EPA.   Consequently, we respectfully submit that Plaintiff's claim for retaliation under Law 115 must likewise be dismissed.

### E.   Law 100 and Law 69

Defendants respectfully submit that Plaintiff's claims under Law 100, Law 17, and Law 69 must also fail.

Law 100, 29 L.P.R.A. 146 *et seq.*, Law 17, 29 L.P.R.A. 155 *et seq.*, and Law 69, 29 L.P.R.A. 1321 *et seq.,* as amended, essentially make it unlawful for an employer to

discriminate against an employee for reason of his age, race, color, gender, social or national origin, social condition, civil status, political affiliation, or political or religious ideals.   Each imposes civil liability on any employer who terminates, suspends, or discriminates against an employee for any of the aforementioned reasons, with respect to the terms and conditions of his employment, including, *inter alia,* compensation, work schedule, location, and privileges and benefits

As discussed in previous sections, Plaintiff has never been discriminated against, harassed or subjected to a hostile work environment because of her gender.   In order to avoid being repetitious, we respectfully refer the Court to the discussion of Plaintiff's claims under the EPA and Title VII.   Accordingly, we respectfully aver that Plaintiff's claims are devoid of merit, and must be dismissed.

### F.    Damages

Defendants respectfully submit that Plaintiff's claims for damages under Articles 1802 and 1803 of the Puerto Rico Civil Code must also be dismissed.

Defendants aver that Plaintiff is not entitled to punitive damages, costs, prejudgment interest, or any other form of damages, due to the fact that any and all damages alleged in the Complaint can be attributed exclusively to Plaintiff's own acts and omissions.

Defendants maintain that Plaintiff suffered no damages, and that any and all damages claimed in this action are speculative, unforeseen, and excessive.   Furthermore,

Plaintiff is barred from recovery for any damages alleged in the instant case because there is no causal relationship between the damages alleged and the alleged acts of discrimination.   Finally, if Plaintiff suffered damages (which Defendant denies) she is barred from recovery because she failed to mitigate damages.

## IV. PROPOSED STIPULATIONS AND/OR
## ADMITTED OR UNCONTESTED MATERIAL FACTS

The following facts have been stipulated and/or are admitted or uncontested:

1.     Plaintiff began her employment with IAS in 2005, as a Specialist II, assigned to the Performance Aerodynamics / Thermodynamics Department.

2.     Her starting salary was $40,000.00.

3.     Her starting salary was consistent with IAS' salary guidelines at the time.

4.     In late 2007, IAS identified a need for a Manager in the Project Management department.

5.     In late 2007, Plaintiff was working in the Project Management Department as a Specialist II, with Capability B.

6.     In November 2007, IAS published a job posting for several positions.

7.     Mr. Alex Soto submitted his resume to IAS, and was interviewed by two (2) departments: the Design Department and the Project Management Department.

8.     Mr. Adam Gravseth, who interviewed Mr. Soto, recommended him for a management level position.

9.     Mr. Gravseth urged Mr. Soto to consider the benefits of working closer to home,

as well as the possibility for rapid growth that IAS offered, and eventually convinced him to accept the offer and work at IAS.

10. In September 2008, Plaintiff was promoted to Specialist III, with a salary of $50,000.00.

11. On March 12, 2009, Ms. Díaz submitted a letter to the Human Resources Department, in which she discussed her concerns over the pay disparity between herself and Mr. Soto.

12. At that time, the Human Resources Department indicated to Ms. Díaz that an investigation would be conducted, and she would be informed of the results.

13. Ms. Neysa Colón was the person assigned in Human Resources to perform a salary analysis, after which she rendered a document to Mr. Mercado.

14. After a performance-based analysis was undertaken, IAS informed Ms. Díaz that, as a good faith effort to resolve her concern, the Company was willing to match her salary to that of Mr. Soto.

15. Ms. Díaz was unsatisfied with the prospective adjustment offer, and demanded that the adjustment be retroactive.

16. In a further attempt to solve the matter amicably and expeditiously, IAS agreed to a retroactive adjustment of Ms. Díaz's salary.

17. Such retroactive payment would have resulted in a lump-sum payment of the differential for seven (7) months and the immediate adjustment.

18.   IAS, however, simply conditioned the retroactive adjustment to the execution of a no-fault general release.

19.   Plaintiff did not sign the agreement.

20.   The offer was subsequently withdrawn by IAS.

21.   After her complaint of alleged salary disparity, Plaintiff has continued to work at IAS.

22.   After her complaint of alleged salary disparity, Plaintiff has continued to receive pay increases based on merit, and currently has a salary of $58,080.48, an increase of $8,080.48 since she first complained.

23.   Her salary is consistent with IAS' current salary scales.

24.   She is eligible for promotions based on merit.

25.   Ms. Díaz receives yearly evaluations.

26.   When Mr. Adam Gravseth took on the position of Manager of the Project Management Department, he had to physically relocate to the area where the Project Management department was located.

27.   The available cubicle to which Gravseth was assigned was across from Plaintiff's desk.

28.   The change only lasted approximately three (3) to four (4) months, after which Mr. Gravseth returned to his position as Chief of Operations.

29.   The Utilization Rate ("UR") is the percent of hours billed versus time spent in the

workplace.

30.   The average UR of a department is the measure upon which the department's (and the manager's) performance is evaluated.

31.   In approximately April of 2009, Ms. Anayanssi Díaz was completing an important, highly complex project for the Pratt & Whitney CSMC team, the HPW3000 program.

32.   The HPW3000 project was near completion.

33.   At the same time, between March and May of 2009, another complex CSMC project was beginning, the FanDemo project.

34.   The FanDemo project was highly sensitive, and the client requested that it have restricted access.

**Plaintiff:**


**Defendant:**

Defendant respectfully submits that the following facts are uncontested:

1.   Due to the nature of the work that IAS wanted to attract, there was also an identified need for a Specialist III position.

2.   As a result, around November 2007, a job posting for several positions was published.

3.   Mr. Soto gave very strong interviews, and all those who interviewed him agreed

that he was an excellent candidate, whose education and relevant experience in project management would allow the company to accept more complex assignments.

4.      He had a strong background in Project Management, inasmuch as he had four (4) years of experience as a Project Manager, which the interviewers felt would translate well to working with IAS.

5.      Also, Mr. Soto had Master's level courses and experience in both Nuclear and Mechanical Engineering, which could be very valuable to IAS.

6.      Furthermore, at the time of his interview, Mr. Soto showed great potential for rapid promotion within the company to a position of greater responsibility.

7.      Mr. David Connor testified during his deposition that his assessment of Mr. Soto was that he was "very good".

8.      Mr. Soto was earning a substantially higher salary than IAS usually offered at his current job, approximately $90,000.00.

9.      Consequently, in order to retain him, IAS determined it would be necessary to make him a competitive offer.

10.     Based on his resume and strong interview, it was decided that he would be offered a Specialist III position, at a starting salary of $65,000.00.

11.     If he performed well within his first year, he would be promoted to a managerial position.

12. When the offer was extended to Mr. Soto, he contacted IAS and informed that the salary offered was below his expectations.

13. Her salary was based on her progression in accordance with IAS' merit system.

14. The investigation revealed that the disparity resulted from the fact that Mr. Soto gave very strong interviews, and all those who interviewed him agreed that he was an excellent candidate, whose education and relevant experience in project management would allow the company to accept more complex assignments.

15. He had a strong background in Project Management, inasmuch as he had four (4) years of experience as a Project Manager, which the interviewers felt would translate well to working with IAS. Also, Mr. Soto had Master's level courses and experience in both Nuclear and Mechanical Engineering, which could be very valuable to IAS.

16. At the time of his interview, Mr. Soto showed great potential for rapid promotion within the company to a position of greater responsibility.

17. Furthermore, since he had been earning a great deal more where he worked at the time of his interview, it was necessary to offer him a competitive salary in order to retain him as an employee.

18. At the time, another similarly situated Specialist III, who was a male, was earning less than Ms. Díaz.

19. Consequently, IAS concluded that no irregularities had motivated the pay disparity.

20.    This practice is totally acceptable and reasonable, and had the purpose of settling with Ms. Díaz any and all disputes regarding her employment **up to the date of the execution of the release.**

21.    To be clear, the release agreement did not extend to any claims arising after the execution of the same.

22.    Ms. Díaz requested time to consider IAS' offer, and ultimately decided, on advice of her attorney, that she would not accept the salary adjustment nor the retroactive salary increase conditioned on the execution of the release agreement.

23.    It must be noted that as of this date, there are two (2) similarly situated male employees in the position of Specialist III who earn less than the Plaintiff.

24.    Her evaluations are generally positive.

25.    Throughout her career at IAS, Plaintiff has been assigned work in the same manner as other employees.

26.    She was assigned complex projects when they were available.

27.    Complex projects are not always available.

28.    If no complex projects were available, Plaintiff would be assigned the work that was available at the time that best suited her skills and the Company's needs.

29.    Depending on how much work is available in Plaintiff's department, work is sometimes re-assigned or re-distributed to ensure that everyone has a balanced work load.

30. This is a typical practice within the department.

31. Plaintiff has had problems with absenteeism since 2009, when she returned from maternity leave.

32. As of August 2011, Plaintiff had only attended work 53% of working days.

33. Of the days she has attended, 13% of the time she has left without completing an 8-hour day.

34. Plaintiff's supervisors concur that her absenteeism has affected their ability to assign her high level work, because they cannot rely on her.

35. Ms. Josymar Acosta, Plaintiff's current supervisor, testified during her deposition since Ms. Díaz does not come to work consistently, her work often has to be re-assigned to other employees, which is very disruptive.

36. Ms. Acosta explained that big projects are very important to the company, and must be assigned to employees who will be there for the client and for the team.

37. Moreover, since large projects are so important, they are highly coveted, and it is essential that they go to the best person for the job.

38. If a big project is not properly supported, the company risks losing the project, or even the client.

39. Mr. David Connor, former Discipline Chief of Plaintiff's department; and Ms. Josymar Acosta, Plaintiff's current supervisor, both testified during their depositions that they have no reservations as to the type of work Plaintiff can

perform, but she has to attend work consistently in order to receive top assignments.

40.   In fact, Ms. Acosta testified during her deposition that she would "love" to be able to market Plaintiff's skills in order to get complex work for her and the company, but with her attendance issues, it is not possible at this point.

41.   Approximately in April of 2009, he was asked by IAS' General Manager at the time, Jim Becker, to temporarily assume the duties of Manager of the Project Management Department because the company was not satisfied with the performance of Mr. David Connor in that position, and would be transferring him to the position of Discipline Chief.

42.   Due to space constraints, Mr. Jim Becker and Mr. Jeff Tracy advised him that no manager-type cubicles were available, and that he would occupy a vacant supervisor-style cubicle.

43.   Mr. Gravseth testified during his deposition that the low department UR of the Project Management department was part of the reason he was called upon to assume management of the department.

44.   He conducted a one-on-one inquiry regarding the UR with each employee in his department with a UR under 90%.

45.   Mr. Jim Becker, IAS' Chief Engineer, was directly overseeing the FanDemo project.

46.   Due to the complexity of the FanDemo assignment, Mr. Becker needed a full-time, high-capability Project Management employee to start this program.

47.   Initially, Ms. Díaz was considered for the FanDemo assignment.

48.   However, Ms. Díaz was occupied at the time with the conclusion of the HPW3000 project, and Mr. Becker could not afford to have her working part time on both projects, as it would have disappointed the customers involved.

49.   Consequently, Mr. Becker chose Mr. Alex Soto for the FanDemo project, inasmuch as he was available, capable, and had a skill set suited to the project.

50.   Ms. Díaz subsequently concluded her work on the HPW3000 project.

51.   Since no other large or complex assignments were immediately available, Plaintiff was assigned to other available projects.

52.   Plaintiff testified during her deposition that she does not know why Mr. Soto was assigned to work on that project.

53.   Mr. Jeffrey Tracy, who was in charge of approving I-Pass petitions, testified that during his employment at IAS, efforts were underway to tighten IAS' security practices, including IT and network security.

54.   For that purpose, the Federal Bureau of Investigation was brought to IAS on more than one occasion to provide awareness to IAS' management on how to improve security at IAS' facilities.

55.   This was necessary due to the fact that IAS carries out projects for the Department

of Defense, and works extensively with export-controlled information.

56.   An I-Pass provides remote access to IAS' network and servers, which contain both export controlled and proprietary information.

57.   As part of IAS' efforts to improve security, Mr. Tracy tightened the requirements for obtaining an I-Pass, limiting it to managers, supervisors, and certain employees who were involved with projects that required remote access to IAS' network, either based on travel, or at the client's request.

58.   Mr. Tracy testified that working from home was not a good enough reason to issue an I-Pass.

59.   Mr. Tracy communicated this policy in an email to all managers at IAS.

60.   Based on the new policy regarding the approval of I-Pass requests, Mr. Tracy denied a number of I-Pass requests to both males and females.

61.   In 2009, Ms. Josymar Acosta, Ms. Díaz's supervisor, approached Mr. Tracy and indicated that Ms. Díaz was interested in receiving an I-Pass so that she could work from home.

62.   Mr. Tracy notified Ms. Acosta that working from home was not sufficient reason to issue an I-Pass.

63.   Ms. Acosta then informed Mr. Tracy that there were medical reasons for the request.

64.   Mr. Tracy then referred the matter to the Human Resources Department, which

indicated that Ms. Díaz should submit a medical certificate evidencing her need to work from home with an I-Pass.

65. Once the information was provided, Mr. Tracy considered Ms. Díaz's request, and determined that she could complete the majority of her work at home on a company laptop, without an I-Pass.

66. He then notified Ms. Díaz's supervisor of his inclination to deny the request.

67. Mr. Tracy never formally denied Ms. Díaz's request for an I-Pass, and her application for an I-Pass was eventually granted in 2010.

68. However, Ms. Josymar Acosta testified during her deposition that, though Plaintiff received an I-Pass, Ms. Díaz has never requested to work from home, with or without the I-Pass.

69. Ms. Acosta would have knowledge of this because employees must inform either their supervisor or their manager that they intend to work from home, and discuss with them the timeframe and tasks that they propose to complete outside the office.

70. Plaintiff admits that she has received several merit bonuses during her employment at IAS.

71. During her deposition, Plaintiff testified that she felt "harassed" by Mr. Gravseth because when he became her supervisor, the first thing he allegedly did was call her into his office and ask her why her Utilization Rate ("UR") was below the

target of 90.

72.   Regarding the alleged harassment she suffered from Mr. Luis Mercado, Plaintiff testified that the incidents which she characterizes as harassment are limited to one (1) occasion on which Mr. Mercado asked her about her performance on a certain project; one (1) occasion on which Mr. Mercado asked her about another employee whom Plaintiff alleged also had concerns about salary disparity; another occasion on which Mr. Adam Gravseth indicated to her that Mr. Mercado had requested to schedule a meeting with her to follow up on how she felt at work after the pay disparity claim; and the fact that Mr. Mercado had stopped by the security office when she had her alleged panic attack to see what was going on.

73.   All of Defendants' exhibits have been duly authenticated.

## V.   NAMES AND ADDRESSES OF WITNESSES AND BRIEF STATEMENT AS TO THEIR TESTIMONY

**Plaintiffs:**

1.   Anayanssi Díaz who is the plaintiff in this case.

2.   Neysa Colón will testify about her involvement in plaintiff's evaluation; her participation in the meetings at Infotech; her knowledge of the problems regarding the affirmative action plan at Infotech and the salary disparities she had encountered.   She will also testify about the investigation by the State Insurance Fund and her suspension for giving the investigator a document.

3.   Cristobal Rivera will testify about his hiring process at the time Soto was hired.   He will testify about Díaz' performance and Soto's performance, since he was the director of the department they were both assigned.   He will testify about all incidents he witnessed regarding Díaz' promotion, job assignments and salary dispute.

4.   Mr. Angel Sierra will testify about Díaz's need for an IPASS and his participation in her request.   He will testify about Díaz's performance.

5.   Ms. Arlene Vives will testify about all the negotiations regarding the salary increase requested by plaintiff.

6.   Mr. Dave Connor will testify about plaintiff's and Soto's performance.

**Defendant:**

Defendants could call any of the following witnesses during the trial of this case:

1.   Co-defendant Luis Mercado: May testify as to IAS' non-discriminatory employment practices, the *bona fide* factors other than gender which account for the salary disparity between Plaintiff and Mr. Alex Soto, the Company policies and rules, the matters included in the statement provided for this case, as well as to any of the facts directly or indirectly related to the allegations of the Complaint or the causes of action pending in this case.

2.   Co- defendant Adam Gravseth- May testify as to IAS' non-discriminatory treatment of Plaintiff, the matters included in the statement provided for this case, as well as to

any of the facts directly or indirectly related to the allegations of the Complaint or the causes of action pending in this case.

3.    Co-defendant Jeff Tracy- May testify as to IAS' non-discriminatory treatment of Plaintiff, the matters included in the statement provided for this case, as well as to any of the facts directly or indirectly related to the allegations of the Complaint or the causes of action pending in this case.   His address is: .

4.    Ms. Josymar Acosta- Manager of Project Management Department of IAS.   May testify as to Plaintiff's employment at the hotel, performance, disciplinary issues, the non-discriminatory manner in which she has been treated, as well as any other aspect of the case as to which she has personal knowledge. Ms. Acosta may be reached at: Infotech Aerospace Services, Inc., Road 112, Km. 2.3 Interior, Mora Guerrero Industrial Park, Isabela, Puerto Rico 00662

5.    Mr. James Becker- Former Chief Engineer for IAS.   May testify as to the non-discriminatory reasons for assigning Mr. Alex Soto to the FanDemo project instead of Ms. Anayanssi Díaz, as well as any other aspect of the case as to which he has personal knowledge. Mr. Becker may be reached at:   57 Jasmine Lane, Glastonbury, CT 06033.

Defendants reserve the right to call in its case-in-chief any of the witnesses listed by the Plaintiff, including the Plaintiff herself.

Defendants reserve the right to supplement and/or make changes to this witnesses list, to add additional witnesses, and/or eliminate witnesses from this list.  Moreover, Defendants reserve the right to refrain from using any of the witnesses set forth in this list to the extent they might deem their testimony unnecessary, redundant or accumulative, or for whatever reason. The decision not to use any of those particular witnesses shall not constitute a waiver of any claims asserted nor interpreted as a presumption that the testimony of the witness shall be deemed as voluntarily undisclosed and accordingly presumably adverse as to its contents.

Defendants will have an English/Spanish interpreter available if any of their witnesses requires one.

## VI.   DOCUMENTARY AND MATERIAL EVIDENCE EXHIBITS

The parties have stipulated the following exhibits:

1.    Plaintiff's Personnel File, from which, at minimum, the following documents will be presented:

     a.    Anayanssi Díaz's letter dated April 15, 2011, informing Plaintiff of her merit increase;

     b.    Anayanssi Díaz's performance Feedback Summary 2007-2008;

     c.    Anayanssi Díaz's performance Feedback Summary 2008-2009;

     d.    Anayanssi Díaz's performance Feedback Summary 2009-2010;

     e.    Anayanssi Díaz's performance Feedback Summary 2010-2011;

      f.      Anayanssi Díaz's 2011 attendance record;

2.     Infotech Aerospace Services Job Posting from November 2007;

3.     Emails between Margarita Piñeiro and Adam Gravseth dated December 10, 2007;

4.     Emails between Mr. Adam Gravseth and Mr. Scott Leslie, dated January 2, 2008;

5.     Six (6) emails between Mr. Adam Gravseth, Scott Leslie and Margarita Piñero, dated January 2-8, 2008;

6.     Capability Assessment of Alex Soto;

7.     IAS Salary Scale for Specialist I, II, III, and Supervisors, effective October 8, 2008;

8.     Anayanssi Diaz's letter requesting investigation of salary;

9.     Salary Evaluation made by Neysa Colon;

10.     Alex Soto probationary evaluation of 6/26/08,

11.     Capability Assessment of Anayanssi Díaz 2009;

12.     2009 Project Management Department Organizational Chart;

13.     List of out of range salaries of 2010;

14.     List of out of range salaries 2009;

15.     Project Management Salary History;

16.     Summary Alex Soto performance ratings;

17.     Soto Corrective Action Report

18.     Capability assessment Anayanssi Díaz dated March 27, 2009,

**Plaintiff:**

Plaintiff has identified the following additional documents which may be used at trial:

1.      Minutes of meeting by Díaz dated March 29, 2009

2.      Email from Díaz to Hector Rodriguez dated April 29, 2009

3.      Email from Díaz to Mercado dated April 6, 2009

4.      Email from Díaz to Mercado dated April 13, 2009

5.      Letter from Vives to Mercado dated April 15, 2009

6.      Letter from Vives to Seda dated April 21, 2009

7.      Emails regarding high complexity project assigned to Díaz, March 11 to 16.

8.      Draft of agreement

9.      Letter by Seda to Vives dated May 8, 2009

10.     Emails between Díaz and Gravseth dated June 19, 2009

11.     Email from drumtra to Díaz dated April 24, 2009

12.     Minute by lienau dated march 20, 2009

13.     Medical records

14.     Expert report

**Defendant:**

Defendants have identified the following additional documents which may be used at trial:

1.      Salary Scale in force at IAS from 2006 until 2008;

2.      Resumé of Alex Soto, as submitted for consideration to IAS;

3.      Record of Interview of Alex Soto (Human Resources and Technical) by Margarita

        Piñero, Janine Ellin, and Ana Lyons;

4.      List of Specialist III employees as of July, 2011;

5.      Expert Report of Dr. Raúl López;

Defendants could also use any and all the Exhibits attached to its Motion for Summary Judgment and its Reply to Opposition to Motion for Summary Judgment, including those listed above.   Defendants expressly reserve the right to use all depositions taken in this action for any and all purposes for which they are admissible.

Furthermore, Defendants reserve the right to present additional evidence or make changes to this list.

## VII. EXPERT WITNESSES
## AND BRIEF STATEMENT OF THEIR TESTIMONY

**Plaintiffs:**

Dr. Flavio Lugo Gutiérrez.

**Defendant:**

Defendants will present the testimony of Dr. Raúl López, a forensic psychicatrist, who performed an Independent Medical Evaluation of the Plaintiff in the case.   Dr. López will rebut the testimony of Dr. Fabio Lugo; and testify as to the extent of Plaintiff's damages, and the lack of causal nexus between her alleged damages and the facts alleged in the Complaint.

## VIII. CLAIMS OR DEFENSES DEEMED WAIVED OR ABANDONED

**Plaintiff:**

None.

**Defendants:**

None by the Defendant.

## IX. LIST OF ALL PENDING MOTIONS

**Plaintiff:**

Motion for Summary Judgment.

**Defendants:**

Defendant's Motion for Summary Judgment remains pending before the Honorable

Court.

## X.   ESTIMATED LENGTH OF TRIAL

**Plaintiff:**

Three days.

**Defendants:**

Defendants estimate that they will need at least three (3) days to present their evidence.

## XI. SCHEDULED DATE OF TRIAL AND POTENTIAL PROBLEMS CONCERNING ATTENDANCE OF PARTIES OR ESSENTIAL WITNESSES

**Plaintiff:**

**Defendants:**

No trial date has been scheduled at this time.

## XII.   ITEMIZED STATEMENT OF SPECIAL DAMAGES

**Plaintiff:**

**Defendants:**

Defendants contest any special damages claimed by the Plaintiff.

## XIII.   SETTLEMENT

**Plaintiff:**

**Defendants:**

Plaintiff has not extended any settlement offers to the Defendants

## XIV.   RESERVATIONS AND OTHER MATTERS

**Plaintiffs:**

1. Plaintiff reserves the right to call such rebuttal witnesses as it may be necessary without prior notice thereof to the other party.

2.  Plaintiff reserves the right to use any of the exhibits or witnesses announced by the defendants in this Pretrial Order.

3.  Plaintiff reserves the right not to use any of the Exhibits or witnesses herein announced and no adverse inference will be drawn from her failure to present them at trial.

4.  Plaintiff reserves the right to further supplement the list of documentary evidence upon leave from the Court and for good cause.

5.  Plaintiff objects the use of James Becker as witness. He was never announced during discovery as a potential witness nor even as a person with knowledge of the facts.

6.  Plaintiff reserve the right to request to the Court through Motions in Limine the exclusion of evidence as deemed necessary and warranted under applicable law.

**Defendants:**

1.      Defendants reserve the right to file before this Court motions "in limine" regarding testimony or documentary evidence or any other motions prior to or during the trial of this case concerning any factual or legal matter.

2.      Defendants reserve the right to call such rebuttal witnesses as may be necessary, without prior notice thereof to the other party, just as to make use of rebuttal documents.

3.      Defendants reserve the right not to use any of the Exhibits or witnesses herein announced and no adverse inference will be drawn from her failure to present them at trial.

4. Defendants also reserve the right to amend this Proposed Pre-Trial Order completely or partially subject to any events that take place before trial and have not been anticipated herein and/or for good cause.

5. Defendants object to any attempt by Plaintiff to amend the Complaint.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 12th day of January, 2012.

| | |
|---|---|
| **THE LAW OFFICES OF**<br>**PEDRO ORTIZ ÁLVAREZ, P.S.C.**<br>P.O. Box 70294<br>O'Neill Street, G-8<br>Hato Rey, Puerto Rico 00918<br>Tel: (787) 758-9243<br>Fax: (787) 841-0000 | **ADSUAR MUÑIZ GOYCO SEDA**<br>**& PÉREZ-OCHOA, P.S.C.**<br>Counsels for Defendants<br>P.O. Box 70294<br>San Juan, Puerto Rico 00936-8294<br>Tel.: 787-756-9000   Fax:   787-756-9010 |
| **/s/ Johanna M. Emmanuelli Huertas, Esq.**<br>USDC-PR No. 201506<br>jmeh@poapr.com | **/s/ Edwin J. Seda- Fernández, Esq.**<br>USDC-PR No. 205212<br>email: seda@amgprlaw.com |
| | **/s/ Mariel Y. Haack, Esq.**<br>USDC-PR No. 221608<br>email:   mhaack@amgprlaw.com |